UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TONY LEE SMITH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 2:14-cv-00049 |
| | ) | Judge Sharp/Bryant |
| CUMBERLAND COUNTY, | ) | |
| TENNESSEE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Angela Darlene Smith ("Ms. Smith" or "the decedent") was shot and killed by Deputy Dustin Hensley of the Cumberland County Sheriff's Department ("Deputy Hensley") on May 29, 2013, when Deputy Hensley and other law enforcement officers responded to reports of a prowler. Ms. Smith's children and their father ("Plaintiffs") brought this action as next kin, alleging that Ms. Smith was wrongfully killed in violation of the Fourth, Eighth, and Fourteenth Amendments and in violation of Tennessee's Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101 *et seq.* ("TGTLA"). Defendants are Deputy Hensley, Cumberland County Sheriff Butch Burgess, and Cumberland County, Tennessee.[1] Pending before the Court is Defendants' Motion for Summary Judgment (Docket No. 30), to which Plaintiffs have filed a response in opposition (Docket No. 35) and Defendants have replied (Docket No. 38). For the reasons set forth below, the Court grants Defendants' Motion.

---

[1] Plaintiffs originally included as Defendants the City of Crossville, Tennessee, David Beaty, who is the Chief of Police for the Crossville Police Department, and John Doe employees of the City of Crossville. The parties subsequently stipulated to the dismissal of the Crossville Defendants, leaving only the Defendants from Cumberland County. (Docket No. 22).

1

# I. Factual & Procedural Background

The following factual background focuses on the evidence that is either directly relevant to deciding the issues presented, or is otherwise necessary to provide a full narrative of the events in question. Because the below-described incident resulted in Ms. Smith's death, the vast majority of the facts are, of necessity, drawn from Defendants' accounts of the night in question. Unless otherwise noted, the following facts are drawn from Defendants' Statement of Undisputed Facts (Docket No. 32) and Plaintiffs' response thereto (Docket No. 36). Important factual disputes are highlighted where they arise, and the facts are construed in the light most favorable to Plaintiffs when supported by admissible evidence.

In the early morning hours of May 29, 2013, officers of the Crossville Police Department ("CPD") responded to a report of a female prowler at the Camelot housing subdivision in Crossville. Responding Officer Donathan Johnson of CPD observed the suspected prowler, who was subsequently identified to be Ms. Smith, run across the road and between two houses in the subdivision. Officer Johnson notified other officers via radio that he had located the suspect on Ivanhoe Lane before leaving his patrol car to follow Ms. Smith on foot. During this pursuit, Ms. Smith stopped, pointed a pistol toward Officer Johnson and told him to leave her alone. Officer Johnson directed Ms. Smith to drop the gun but she did not comply and instead continued running behind a house. Officer Johnson then used his radio to let other officers know that the suspect was armed with a pistol before again giving chase and commanding Ms. Smith to stop running and drop the gun. Ms. Smith then fired the pistol in Officer Johnson's direction, causing him to take cover behind a house and radio to other officers that shots had been fired.

Two other CPD officers, Officers Jason Wilson and Thomas Burnett, joined Officer Johnson at the scene and went looking for Ms. Smith. A fourth CPD officer, Officer Withrow,

also arrived and retrieved his rifle from his patrol car's trunk. As he did so, Ms. Smith rounded the corner of a house near him and fired a second shot, which hit a tree near Officer Withrow. From there, Ms. Smith went through the backyard of a house and entered a house a few doors down from where Officer Withrow was located. Meanwhile, other officers, including deputies from the Cumberland County Sheriff's Department ("CCSD") and Tennessee Highway Patrol State Trooper Al Seitner ("Trooper Seitner") also responded to assist CPD. Deputy Hensley was among the officers responding on behalf of the CCSD. The CCSD officers and Trooper Seitner set up a perimeter outside the housing subdivision. Officer Johnson soon observed Ms. Smith leave one of the houses and head toward a carport with a gun and some keys in hand. Ms. Smith first got into a truck but then switched to a car parked beside the truck. Two CPD officers saw the gun in Ms. Smith's hand when she entered the car in the carport.

Ms. Smith drove the car out of the carport and through the backyard of several houses in the subdivision, eventually exiting onto Ivanhoe Lane. Ms. Smith was followed through the backyards by Officer Burnett. The remaining CPD officers, Trooper Seitner, and the CCSD officers followed in pursuit of Ms. Smith's vehicle with their lights and sirens activated. The officers followed Ms. Smith down Highway 70 for several miles, during which there was a lot of radio traffic about the subject being armed. Two deputies passed Ms. Smith in their patrol cars in order pull ahead of her and set up spike strips. As these officers passed Ms. Smith, she swerved her car toward their patrol cars. The pursuit ended when Ms. Smith attempted to turn right onto Browntown Road but lost control of the car and drove into a ditch.

Officer Burnett parked directly behind Ms. Smith's vehicle in order to prevent her from backing out of the ditch and resuming her flight. Indeed, Ms. Smith tried to back out of the ditch but was thwarted from doing so because of Officer Burnett's car. As other officers arrived, they

3

parked in various locations near or around Ms. Smith's vehicle. Trooper Seitner retrieved his service weapon, an AR-15 rifle, and approached the right side of the suspect's vehicle. Deputy Hensley of the CCSD arrived, drew his weapon, and exited his car. He first went to his sergeant's car, which was to the left of Ms. Smith's vehicle, before going behind the car and to the right of Ms. Smith's vehicle, near Trooper Seitner's vehicle. Deputy Hensley approached the right side of Ms. Smith's vehicle behind Trooper Seitner. Other officers had already approached Ms. Smith's vehicle from other angles. The officers' testimony implies that they did not develop a unified plan for deescalating the situation before approaching Ms. Smith's vehicle. It bears repeating that because Ms. Smith is deceased, all of the above facts are drawn from the law enforcement officers' accounts of May 29, 2013.

As the officers approached her car, Ms. Smith was in the vehicle's front row with her legs and lower body on the driver side of the vehicle and her torso and head on the passenger side. There is some disagreement as to her exact positioning. For example, Trooper Seitner says that Ms. Smith's head and torso were close to the floorboard on the passenger side but Deputy Hensley only reports seeing Ms. Smith lying across the front seats of the car. At this time, all responding officers had their weapons drawn. Trooper Seitner approached the passenger side of the car and used his baton to smash in the front passenger window.

Deputy Hensley simultaneously approached the passenger side of Ms. Smith's vehicle, carrying his gun in his dominant right hand and his taser in his left hand. (Deposition of Dustin Hensley, Docket No. 34-1 at 65:25; 113:2-10) (hereinafter "Hensley Dep."). Both officers reported that they commanded Ms. Smith to show them her hands and/or to drop the gun. (Hensley Dep. at 60:16-18; Deposition of Al Seitner, Docket No. 34-6 at 16:3-9) (hereinafter "Seitner Dep."). Deputy Hensley did not see a gun in Ms. Smith's hand when he first

4

approached the vehicle, but stated that he saw a firearm in her right hand after Trooper Seitner smashed the window. (Hensley Dep. at 60:19-61:16). Ms. Smith allegedly was lying face down on the front seat with a gun in her right hand, pointed toward the front of the car. (Hensley Dep. at 61-62). Immediately after Trooper Seitner smashed in the car window and upon seeing Ms. Smith holding the gun, Deputy Hensley used his taser on Ms. Smith. Deputy Hensley shot his taser twice. In his deposition, Deputy Hensley stated that the first time the taser connected but the second time the taser jammed or failed to work properly. (Hensley Dep. at 64:12-65:22). The autopsy report shows that the taser left "two dermal punctures and burns of the back." (Docket No. 37-1 at 2). As Deputy Hensley noted in his deposition, a taser may cause the body to move or convulse involuntarily, which he stated occurred in Ms. Smith's case. (Hensley Dep. at 63:24-64:1). According to CCSD policies, tasers are "used to gain control of the subject." (Ex. B to Aff. of Butch Burgess, Jr., Docket No. 33 at 14.1).

It is at this point that troubling factual disputes arise. More precisely, it is at this point that the information contained in the autopsy report begins to cast doubt on Defendants' version of events. Both Trooper Seitner and Deputy Hensley acknowledged that Ms. Smith had been face down on the front passenger when Deputy Hensley deployed his taser. Both officers also stated that after Deputy Hensley's use of the taser, Ms. Smith's torso rose up and that she pointed gun at Trooper Seitner. (Seitner Dep. at 20-21; Hensley Dep. at 66:5-67:4). Given that all of this unfolded in a matter of mere seconds, (Seitner Dep. at 44), it does not appear that Deputy Hensley paused to assess the effectiveness of the taser. Indeed, Deputy Hensley and Trooper Seitner stated that as soon as Ms. Smith rose up and was facing out the passenger window, Deputy Hensley shot her. (Hensley Dep. at 66, 112; Seitner Dep. at 20, 25, 44). However, the officers' statements are directly undermined by the autopsy report, which shows that all ten

5

bullets pierced Ms. Smith *in the back*, from her upper shoulder to her lower back. (Docket No. 37-1 at 3-7). Thus, the entry points of the bullets stands in flat contradiction to Deputy Hensley's and Trooper Seitner's claims that Ms. Smith was upright when shot.

Deputy Hensley fired at Ms. Smith until his gun ran out of ammunition. The autopsy report reveals that Ms. Smith was struck by ten separate bullets. (Docket No. 37-1 at 1-2). Only then, claims Deputy Hensley, was the threat neutralized. (Hensley Dep. at 67-68). Deputy Hensley then reloaded his firearm, although he did not again shoot Ms. Smith. Instead, Deputy Hensley recovered the gun Ms. Smith had with her in the vehicle. Ms. Smith was transported to the Cumberland Medical Center where she was pronounced dead on arrival. In addition to the ten gunshot wounds to her back and the taser burns, the autopsy report reveals that Ms. Smith had significant amounts of methamphetamine and amphetamine in her system at the time of her death. (Docket No. 37-1 at 9).

Ms. Smith's two children and their father acting on their behalf filed this suit as next kin. As of now, the only remaining Defendants are Cumberland County, Tennessee, Butch Burgess, individually and in his capacity as Sheriff of Cumberland County, Deputy Sheriff Dustin Hensley, individually and in his capacity as a deputy with CCSD, and CCSD Deputy Does 1-10. Defendants seek summary judgment on all claims. They argue that Deputy Hensley and Sheriff Burgess are entitled to qualified immunity from suit and that Deputy Does 1-10 must be dismissed at this point. Additionally, Defendants argue that Plaintiffs have not presented any evidence to show that Cumberland County has a policy or custom that gives rise to the constitutional violations alleged here. Should the Court agree, Defendants argue, then Plaintiffs' state law claims must also fail for lack of subject matter jurisdiction.

## II. The Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if the materials in the record "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Barker v. Goodrich, 649 F.3d 428, 432 (6th Cir. 2011) (internal quotation marks omitted). The Court must draw all inferences in the light most favorable to the non-moving party. "If, in doing so, there is sufficient evidence for a trier of fact to find for the non-moving party, a genuine dispute of material fact exists." Mullins v. Cyranek, No. 14-3817, 2015 WL 6859303, at *3 (6th Cir. Nov. 9, 2015) (citation omitted).

Plaintiffs have opposed Defendants' Motion for Summary Judgment only to the extent that Defendants seek summary judgment on the claims against Deputy Hensley. Plaintiffs "agree[] to the dismissal of all other claims other than against Deputy Hensley." (Docket No. 35 at 5). The Court will therefore treat as unopposed Defendants' Motion for Summary Judgment as to the claims against Sheriff Burgess and Cumberland County.

## III. Plaintiffs' Claims Under the Eighth and Fourteenth Amendments

As a threshold matter, the Court agrees with both parties that Plaintiffs' claims arising from the events of May 29, 2013 are properly considered under the Fourth Amendment. Plaintiffs allege that the Defendants used excessive force when arresting Ms. Smith. This qualifies as a seizure under the Fourth Amendment, not a denial of due process under the Fourteenth Amendment. The Supreme Court has stated that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Graham v. Connor, 490 U.S. 386, 395 (1989). Similarly, because Ms. Smith's claims arose during her arrest, not as

part of confinement, her claims cannot make their home in the Eighth Amendment. See Dillingham v. Millsaps, 809 F. Supp. 2d 820, 838 (E.D. Tenn. 2011) (citing Aldini v. Johnson, 609 F.3d 858, 864 (6th Cir. 2010)) ("In order to raise an Eighth Amendment 'excessive force' claim, (which falls under the category of 'cruel and unusual punishment'), the plaintiff must have suffered an injury as a prisoner."). To the extent Plaintiffs bring claims under the Eighth and Fourteenth Amendments, those claims fail.

### IV. Deputy Hensley's Claim of Qualified Immunity

Plaintiffs bring claims against Deputy Hensley both individually and in his official capacity. The Court discusses the official capacity issue in Section V.A, below. Deputy Hensley argues that he is entitled to qualified immunity on the individual claims against him, which in turn entitles him to summary judgment.

#### A. Qualified Immunity & Summary Judgment in the Context of Deadly Force Claims

It is difficult to determine qualified immunity on motion for summary judgment in cases involving claims of deadly force. Smith v. Kim, 70 F. App'x 818, 820 (6th Cir. 2003) (citing Sova v. City of Mt. Pleasant, 142 F.3d 898, 902 (6th Cir. 1998)). Qualified immunity cases present two questions: (1) whether the defendant violated a plaintiff's constitutional (Fourth Amendment) rights and, if so, (2) whether that constitutional right was clearly established at the time of the incident. Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 508 (6th Cir. 2012). In Sova the Sixth Circuit explained why asking these questions in the context of deadly force cases makes the summary judgment analysis particularly thorny:

> This Court has established that summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force. When the legal question is completely dependent upon which view of the facts is accepted by the jury, the District Court cannot grant a defendant police officer immunity from a deadly force claim. This is because the reasonableness of the use of force is the linchpin of the case. If the jury determines the officer

shot the suspect without a reasonable belief that he posed a significant threat of death or serious physical injury to the officer or others, then the officer's actions were legally unreasonable under the Fourth Amendment. On the other hand, if the jury believes the officer's version of the facts and finds the officer's conduct was reasonable, then he will be entitled to qualified immunity. Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability. . . . This is especially true considering that the District Court must view the facts in the light most favorable to the plaintiff on a motion for summary judgment.

Sova v. City of Mt. Pleasant, 142 F.3d 898, 902 (6th Cir. 1998) (internal quotation marks and citations omitted). With these complexities in mind, the Court must decide whether qualified immunity entitles Deputy Hensley to summary judgment in the case at bar.

**B.   Factual Record Taken in the Light Most Favorable to Plaintiffs**

As was previously noted, the Court must consider the facts in the light most favorable to Plaintiffs and make all reasonable inferences in Ms. Smith's favor when undertaking the qualified immunity analysis on a motion for summary judgment. Godawa v. Byrd, 798 F.3d 457, 463 (6th Cir. 2015) (citing Davenport, 521 F.3d at 550). In the instant case, the Court's ability to consider the facts in the light most favorable to Ms. Smith is constrained by the fact that Ms. Smith is no longer with us to attest to the events of May 29, 2013. That being said, the autopsy report and the sometimes inconsistent testimony of Defendants allows the Court to draw at least two inferences in Plaintiffs' favor. First, the Court will assume that any momentary upward motion of Ms. Smith's torso after Trooper Seitner smashed in the passenger window was an involuntary reaction to Deputy Hensley's use of his taser, not deliberate movement. Second, the Court will assume, as the autopsy report clearly indicates, that Ms. Smith was face down on the front seat, not upright, when Deputy Hensley shot her. Under this factual account, Ms. Smith may have had access to a firearm while trapped in the car and surrounded by law enforcement

9

officers, but she was not upright and pointing it at the officers at the time Deputy Hensley emptied his magazine into her back.

**C.     The Fourth Amendment Violation**

The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers. Godawa v. Byrd, 798 F.3d 457, 463 (6th Cir. 2015) (citation omitted). Nonetheless, the government has a "right to use some degree of physical coercion or threat thereof" to effectuate an arrest. Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). Claims alleging the use of excessive force during an arrest are considered under the Fourth Amendment's "objective reasonableness" standard. Graham, 490 U.S. at 388. Under this standard, a court considers whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 39. This analysis examines "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Martin v. City of Broadview Heights, 712 F.3d 951, 958 (6th Cir. 2013) (quoting Graham, 490 U.S. at 396). Additionally, the reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

In applying these principles, we have stated that "only in rare instances may an officer seize a suspect by use of deadly force." Whitlow v. City of Louisville, 39 Fed. App'x. 297, 302–03 (6th Cir. 2002). We have upheld the use of deadly force by a police officer when the factual situation revealed a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer. See Boyd v. Baeppler, 215 F.3d 594, 604 (6th Cir.

2000) (upholding qualified immunity for police officers who used deadly force against a suspect who had a gun in his hand and who pointed it at officers and others); see also Chappell v. City of Cleveland, 585 F.3d 901, 910-16 (6th Cir. 2009) (finding officers were entitled to qualified immunity where they shot a knife-wielding suspect ten times); Livermore v. Lubelan, 476 F.3d 397, 401-05 (6th Cir. 2007) (finding it objectively reasonable for officer to fire two shots at suspect who posed a serious threat to other officers). By contrast, courts should deny qualified immunity where a suspect "poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Tennessee v. Garner, 471 U.S. 1, 11 (1985).

Here, even when viewing the facts in the light most favorable to Ms. Smith, binding precedent compels the finding that Deputy Hensley's use of force did not violate the Fourth Amendment. Although this whole ordeal began with a report of prowling, the gravity of the situation escalated when Ms. Smith fired at responding officers. Putting aside the underlying crime, the crux of the inquiry is whether Deputy Hensley had probable cause to believe that Ms. Smith posed a threat of serious physical harm to himself or others. Deputy Hensley knew that Ms. Smith was armed and had previously fired at other responding officers. He also knew that she had tried to knock two patrol cars off the road and had attempted to resume her flight even after she drove into the ditch. Ms. Smith additionally failed to comply with Deputy Hensley's and Trooper Seitner's repeated commands to drop the firearm and to show her hands. With these facts framing the inquiry, Sixth Circuit precedent indicates that when Deputy Hensley saw Ms. Smith holding the firearm in the vehicle, he had probable cause to believe that she posed a serious threat.

Perhaps the best argument against qualified immunity is the fact that Deputy Hensley apparently did not pause to determine the efficacy of the taser before escalating to the use of deadly force. Failing to see if Ms. Smith had been incapacitated seems inappropriate in light of the fact that Deputy Hensley testified that Ms. Smith responded to tasering as one would expect: with involuntary body movements. Yet even this failure does not save Plaintiffs' claims. A reasonable officer in Deputy Hensley's position could easily interpret any involuntary upward jerking caused by the taser to be yet another sign of Ms. Smith's non-compliance, one that necessitated the use of additional (and deadly) force. Had Ms. Smith not been armed and had she not previously demonstrated such willingness to fire at other law enforcement officers, this argument may well have succeeded. However, Fourth Amendment jurisprudence instructs that where a suspect has a firearm, is clearly prepared to use that firearm, and is not complying with directives, an officer may reasonably use deadly force. See Krause v. Jones, 765 F.3d 675, 680 (6th Cir. 2014) ("Officer Jones fired at [the suspect] after he saw the flash of another gun. An officer in Officer Jones' position—one who saw the flash of a gun pointing at him, who knew that [the suspect] was armed, and who had heard him threaten to shoot—reasonably could think that [the suspect] posed a serious threat to him and the two officers behind him. For that reason, Officer Jones acted reasonably in using deadly force.").

Notably, Plaintiffs' claim is not saved by the fact that Deputy Hensley shot Ms. Smith ten times, a number which certainly brings to mind the word "excessive." The Supreme Court recently rejected the argument that where deadly force is reasonable, a police officer can still be liable for using too much deadly force: "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." Plumhoff v. Rickard, 134 S. Ct. 2012, 2022 (2014).

Plumhoff indicates that if Deputy Hensley was justified in using deadly force, the sheer volume of bullets he used will not provide an independent avenue to liability, no matter how excessive it may seem.

Sixth Circuit precedent compels the Court to find that Deputy Hensley's conduct was reasonable under the circumstances. Because the Court must find that no constitutional violation occurred, it need not reach the question of whether that right was clearly established at the time. Deputy Hensley is entitled to summary judgment on the claims against him as an individual.

### V. Plaintiffs' Remaining Claims

As noted above, Plaintiffs oppose summary judgment only with respect to Deputy Hensley's claim of qualified immunity. (Docket No. 35 at 5). The Court will therefore treat the remainder of Defendants' Motion for Summary Judgment as unopposed under Federal Rule of Civil Procedure 56(e).

**A.  Official Capacity Claims Against Defendants Burgess and Hensley**

Defendants argue that claims against Defendants Burgess and Hensley, who are both employed by the CCSD, are redundant of the claims against Cumberland County. The Court agrees. Claims against officers in their official capacities "are deemed to be brought against the governmental entity that employs those individual defendants." Lockwood v. Mason Cnty. Sheriff's Dep't, 187 F.3d 636 (6th Cir. 1999) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 68-69 (1989)). Plaintiffs have not disputed Defendants' contention that the claims brought against Defendants Burgess and Hensley in their official capacities are duplicative Plaintiffs' claims against Cumberland County. Because, as discussed in the following section, Plaintiffs' claims against Cumberland County fail, so too must fail the claims against the officers in their official capacities.

### B. Liability of Cumberland County, Tennessee

Plaintiffs also sought to hold Cumberland County liable for the events of May 29, 2013. A government entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978). To prevail in a § 1983 suit against a government entity such as a county, a plaintiff must show that the alleged federal right violation occurred *because of* a policy or custom. Id. (emphasis added). To prove the existence of a policy or custom, "[t]he plaintiff can look to (1) the entity's official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).

Defendants point out that Plaintiffs have not presented any evidence that would support any of these methods of proof. Plaintiffs have not identified any official policies, let alone offered evidence as to how a policy could have caused Ms. Smith's death. Neither have Plaintiffs identified actions by an official with final decision-making authority. While Defendants have submitted evidence of the training Deputy Hensley received, Plaintiffs have not challenged the adequacy of that training. Finally, Plaintiffs have not submitted any evidence that Cumberland County/CCSD is complicit in the violation of federal rights. In light of the complete lack of evidence going to policies and customs, Defendants are entitled to summary judgment on Plaintiffs' claims against Cumberland County.

### C. Claims Against Deputy Does 1-10

Defendants argue that claims against Deputy Does One through Ten fail because Plaintiffs did not properly identify and serve any John Doe defendants within the statute of limitations. To identify and serve any such deputies at this stage would require, Defendants

14

argue, amending the pleadings in compliance with Federal Rule of Civil Procedure 15(c). Again, Plaintiffs do not dispute this contention. Moreover, the record indicates that Plaintiffs have made no efforts to identify or add any additional CCSD deputies. Absent any evidence that additional John Doe deputies even exist, the Court finds that Defendants have carried their burden for summary judgment with respect to claims against Deputy Does One through Ten.

**D.     Plaintiffs' State Law Claims**

The Court has found that Defendants are entitled to summary judgment on all of Plaintiffs' federal claims. "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." Musson Theatrical, Inc. v. Fed. Exp. Corp., 89 F.3d 1244, 1254–1255 (6th Cir.1996); see also 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it ha[d] original jurisdiction"). Without commenting on the viability of Plaintiffs' claims under the TGTLA – claims that, as previously mentioned, the Plaintiffs agree are well-suited for dismissal – the Court declines to exercise supplemental jurisdiction and instead chooses to dismiss Plaintiffs' state law claims.

## VI.     Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Docket No. 30) is granted in its entirety.

An appropriate Order will be entered.

                                                                              _____
                                                                              KEVIN H. SHARP
                                                                              UNITED STATES DISTRICT JUDGE